UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

GENE B. ADAMS and GEORGE HASHMAN and
HOWARD LEON POWELL, JR. and JAMES F. KOWCHECK and
JOHN WEAVER and GERALD C. BARLOW and
TERESA M. BARLOW and EDSEL W. PACK,
Executor of the Estate of WILLIAM A. PACK and
SALLY SILBERNAGEL, Personal Representative
of the Estate of MICHAEL GRUBRYN, and
ROBERT LYLE COPELAND, SR. and WILLIAM J. ZULESKI,
Personal Representative for the Estate of WILLIAM ZULESKI,
Individually and as representatives of a
proposed class on behalf of themselves
and others similarly situated,

        Plaintiffs

v.                                    Civil Action No. 2:05-0527
                                         (Lead Action)

INSURANCE COMPANY OF NORTH AMERICA (INA) and
LIBERTY MUTUAL INSURANCE COMPANY and
CIGNA CORPORATION and
CENTURY INDEMNITY COMPANY and
AMERICAN INTERNATIONAL GROUP, INC. and
AMERICAN INTERNATIONAL UNDERWRITERS and
AMERICAN HOME ASSURANCE COMPANY and
BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA and
GRANITE STATE INSURANCE COMPANY and
INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA and
LEXINGTON INSURANCE COMPANY and
CNA d/b/a CONTINENTAL CASUALTY COMPANY and
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH and
EMPLOYERS INSURANCE OF WAUSAU

        Defendants

and

HAROLD MENINGER and MADISON PEYATTE and
WILLIAM J. ZULESKI, Personal Representative
for the Estate of WILLIAM ZULESKI, and
GLEN E. ROBERTSON and EDSEL W. PACK, Executor
of the Estate of WILLIAM A. PACK, Individually and as
representatives of a proposed class on behalf

of themselves and others similarly situated,

    Plaintiffs

v.                                        Civil Action No. 2:05-0528
                                            (Consolidated Action)


THE TRAVELERS INSURANCE COMPANY and
THE TRAVELERS INDEMNITY COMPANY and
THE TRAVELERS INSURANCE GROUP HOLDINGS INC. and
THE TRAVELERS CASUALTY & SURETY COMPANY
f/k/a AETNA CASUALTY & SURETY COMPANY and
ONEBEACON AMERICA INSURANCE COMPANY
f/k/a COMMERCIAL UNION INSURANCE

    Defendants

and

CHARLES L. WISE and BLANCHE I. HARTLEY,
Executrix for the Estate of OKEY HARTLEY and
SHEILA J. BROWN, Executrix for the Estate of
JAMES ASH, and GEORGE W. YOCUM and
JOHN WEAVER and GERALD C. BARLOW and
TERESA M. BARLOW and BRENDA A. MALONE,
Personal Representative for the Estate of
GERALD EMERSON MALONE, and JAMES SIMMONS and
WANDA MELLOTT, Personal Representative
for the Estate of JAMES MELLOTT, and
TAB F. EDDY, Personal Representative
for the Estate of EDWARD LYLE EDDY,
Individually and as representatives of a
proposed class on behalf of themselves
and others similarly situated,

    Plaintiffs


v.                                        Civil Action No. 2:05-0529
                                            (Consolidated Action)


ONEBEACON AMERICAN INSURANCE COMPANY
formerly known as
COMMERCIAL UNION INSURANCE COMPANY and

BRANDYWINE HOLDINGS INC. and
CENTURY INDEMNITY COMPANY and
KEMPER INSURANCE COMPANY and
LUMBERMENS MUTUAL CASUALTY COMPANY and
AMERICAN MOTORISTS INSURANCE COMPANY and
AMERICAN INTERNATIONAL GROUP, INC. and
AMERICAN INTERNATIONAL UNDERWRITERS and
AMERICAN HOME ASSURANCE COMPANY and
BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA and
GRANITE STATE INSURANCE COMPANY and
INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA and
LEXINGTON INSURANCE COMPANY and
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH

    Defendants

and

CHARLES L. WISE and BLANCHE I. HARTLEY,
Executrix for the Estate of OKEY HARTLEY, and
SHEILA J. BROWN, Executrix for the Estate of
JAMES ASH, and GEORGE W. YOCUM and
JOHN WEAVER and GERALD C. BARLOW and
TERESA M. BARLOW and BRENDA A. MALONE,
Personal Representative for the Estate of
GERALD EMERSON MALONE, and JAMES SIMMONS and
WANDA MELLOTT, Personal Representative
for the Estate of JAMES MELLOTT and
TAB F. EDDY, Personal Representative for the
Estate of EDWARD LYLE EDDY, Individually and
as representatives of a proposed class on behalf
of themselves and others similarly situated,

    Plaintiffs

v.                                    Civil Action No. 2:05-0531
                                       (Consolidated Action)

THE TRAVELERS INDEMNITY COMPANY and
THE TRAVELERS INSURANCE COMPANY and
TRAVELERS PROPERTY CASUALTY CORP. and
AETNA CASUALTY AND SURETY COMPANY
NOW KNOWN AS
TRAVELERS CASUALTY & SURETY COMPANY and

3

INSURANCE COMPANY OF NORTH AMERICA (INA) and
COMMERCIAL UNION INSURANCE COMPANY
NOW KNOWN AS
ONEBEACON AMERICA INSURANCE COMPANY and
ACE USA and
LIBERTY MUTUAL INSURANCE COMPANY and
CIGNA CORPORATION and
A&I COMPANY,

      Defendants

### MEMORANDUM OPINION AND ORDER

      Pending are plaintiffs' motions (1) to reassign this action, filed July 21, 2005, (2) for remand, (3) for oral argument on the remand motion, both filed July 29, 2005, and (4) for substitution of a party, filed November 1, 2005.

      The first motion is based upon the prior assignment of a related case to the Honorable Robert C. Chambers.  Reassignment is inappropriate for at least two reasons.  First, the nature and complexity of the issues in this case and the action assigned to Judge Chambers are distinct.  Second, on October 24, 2005, Judge Chambers remanded the case assigned to him.  The court, accordingly, ORDERS that plaintiffs' motion to reassign be, and it hereby is, denied.

      Regarding oral argument, the parties have filed voluminous briefs and related materials.  The written submissions

adequately present the parties' contentions and argument would
not aid the decisional process.  The court, accordingly, ORDERS
that plaintiffs' motion for oral argument be, and it hereby is,
denied.

        Regarding the requested substitution of a party,
plaintiffs advise that fellow plaintiff William W. Zuleski passed
away on August 16, 2005.  Plaintiffs propose to substitute
Zuleski's duly-appointed executor, William J. Zuleski, in his
stead.  Defendants do not oppose the motion.  The court,
accordingly, ORDERS that the motion for substitution of a party
be, and it hereby is, granted.

        As noted in the style, there are four (4) actions
before the court as follows: (1) <u>Adams v. Aetna, Inc.</u>, 2:05-0527
("<u>Adams</u>"); (2) <u>Meninger v. Travelers Indemnity Company</u>, 2:05-0528
("<u>Meninger</u>"); (3) <u>Wise v. OneBeacon America Insurance Company</u>,
2:05-0529 ("<u>Wise II</u>"); and (4) <u>Wise v. Travelers Indemnity
Company</u>, 2:05-0531 ("<u>Wise I</u>").  As an initial matter, the
briefing reflects a variety of overlapping issues.  The
similarity of these actions is further illustrated by the West
Virginia Supreme Court of Appeals' transfer of all four cases to
the Circuit Court of Kanawha County, appointing the Honorable
Louis H. Bloom to preside.  (<u>Adams</u>' Not. of Remov. ¶ 2).  The

cases were consolidated under the caption of <u>In re: Asbestos-Unfair Trade Practices Cases</u> ("joint action").[1]  (<u>Id.</u>)

The cases, at least for remand purposes, involve a variety of common questions of law, including the applicable burden of proof to support subject matter jurisdiction and the non-bankruptcy-related ground for removal.  The court, accordingly, ORDERS that these actions be consolidated pursuant to Rule 42(a), Federal Rules of Civil Procedure, solely for the purpose of resolving the pending motions.  The court will treat the <u>Adams</u> case as the lead action.  At times, the court will refer jointly to <u>Wise I</u>, <u>Wise II</u>, <u>Meninger</u>, and <u>Adams</u> as the "consolidated actions."

I.

The parties apparently did not upon removal append much of the file found in the circuit clerk's office.  The court, accordingly, relies primarily upon the briefing and the four notices of removal filed in this case, along with their respective attachments, in determining the propriety of

---

[1]The West Virginia Unfair Trade Practices Act is referred to herein as either the "WVUTPA" or the "UTPA."

6

exercising federal jurisdiction.  In order to avoid unduly lengthening this memorandum opinion, the court relies principally upon the briefing and the notice of removal in the <u>Adams</u> case, supplementing the discussion where necessary to account for the factual and legal variances found in the three remaining cases.

On October 25, 2001, <u>Wise I</u> was instituted in the Circuit Court of Berkeley County.  (<u>Wise I</u> Defs.' Memo. in Oppos. at 1).  On June 28, 2002, plaintiff instituted <u>Adams</u> and <u>Wise II</u> in the Circuit Court of Kanawha County.  (<u>Adams</u>' Not. of Remov. ¶ 1; <u>Wise II</u> Pls.' Memo. in Supp. of Remand at 2).  On April 16, 2002, <u>Meninger</u> was instituted in the same court.  (<u>Meninger</u> Not. of Remov. ¶ 1).

The defendants in the joint action moved to dismiss on numerous grounds.  (<u>Adams</u> Not. of Remov. ¶ 3).  Because of the removal, Judge Bloom has not ruled on these motions.  (<u>Id.</u>)  On April 7, 2004, the circuit court stayed the four actions pending two (2) decisions by the supreme court of appeals, subsequently decided June 25, 2004.  (Id.)  Although the date is not specified, sometime after these two decisions counsel for the plaintiffs advised of their intentions to amend the four complaints.  (<u>Id.</u>)  The cases then remained in abeyance for approximately one (1) year without the filing of amended complaints.

On June 10, 2005, Judge Bloom met with liaison counsel for the parties. (<u>Id.</u>)  According to plaintiffs, this conference resulted in "a tight schedule . . . that . . . set [the joint action] for trial in July of 2006 . . . ."  (<u>Id.</u>)  The court directed plaintiffs to file their amended complaints no later than June 13, 2005, to be followed by defendants' answers and dispositive motions by June 30, 2005.  (<u>Id.</u>)  A formal case management order reflected the rulings.  (Id.)

Plaintiff moved to amend in each of the four actions on June 13, 2005.  The effect of these amendments as to the <u>Adams</u>, <u>Wise II</u>, and <u>Meninger</u> cases is best illustrated by comparing the initial and amended <u>Adams</u> complaints.  The original complaint provides pertinently as follows:

> 41.  In response to the mounting asbestos problem, and despite their extensive and long-standing knowledge of the hazards of asbestos, defendants joined with <u>other insureds</u> and companies facing asbestos-related claims to formulate claims settlement strategies aimed at limiting and/or avoiding the "catastrophic" liability problem posed by these claims, <u>including</u> such claims against Garlock, Inc., Georgia-Pacific Corp., Owens-Illinois, Inc., Owens-Illinois Glass Company, Inc., and/or The Flintkote Company.
>
> 42.  Such strategies have in fact been implemented by defendants in the course of defendants' defense of personal injury and wrongful death claims made against <u>their insureds</u> . . . .

43.   The result of these strategies has been to improperly delay the resolution of asbestos personal injury and wrongful death claims (<u>including</u> such claims against Garlock, Inc., Georgia-Pacific Corp., Owens-Illinois, Inc., Owens-Illinois Glass Company, Inc., and/or the Flintkote Company), to improperly depress the settlement values of asbestos personal injury and wrongful death claims (<u>including</u> such claims against Garlock, Inc., Georgia-Pacific Corp., Owens-Illinois, Inc., Owens-Illinois Glass Company, Inc., and/or the Flintkote Company), to improperly thwart the filing of asbestos personal injury and wrongful death claims (<u>including</u> such claims against Garlock, Inc., Georgia-Pacific Corp., Owens-Illinois, Inc., Owens-Illinois Glass Company, Inc., and/or the Flintkote Company) . . . to the financial advantage of defendants and <u>their insureds</u> and to the financial and emotional detriment of asbestos personal injury and wrongful death claimants.

44.   At the times relevant herein, defendants controlled the settlement of claims for <u>their insureds</u>.

(<u>Adams</u> Pls.' Mem. in Supp. of Remand at 4-5 (quoting Compl. ¶¶ 41-44)(emphasis supplied).[2]

    The initial complaint in <u>Wise I</u> is a bit different in form but not substance.  Plaintiffs there sued the defendants for actions arising out of the defense and settlement of personal injury claims against Combustion Engineering Company, AC&S, or

_____

    [2]As in the <u>Adams</u>' complaint, the initial complaints in <u>Wise II</u> and <u>Meninger</u> also mention only certain insureds by name.  Like that same complaint, however, there is language in each that appears directed to defendants' joint misconduct with all of its insureds generally.  (<u>See</u>, <u>e.g.</u>, <u>Wise II</u> compl. ¶¶ 2, 40-43, 48, 54, 60, 64, 69); <u>Meninger</u> compl. ¶¶ 2, 24, 27-30, 34, 40, 46, 50, 55).

A&I Company.  The word "including" is not mentioned in proximity to these insureds, as in the _Wise II_, _Adams_, and _Meninger_ cases. Like _Wise II_, _Adams_, and _Meninger_, however, the 98 page initial complaint is replete with language suggestive of an intent to perhaps later take action against the defendants for their conduct with respect to other insureds they represented.  Indeed, one is left to wonder, given the overarching nature of the lengthy and detailed pleading, why all insureds were not named at that time.  Of particular note are the following allegations, contained within Count II of the initial _Wise I_ pleading:

> 228. Insurers conspired between themselves <u>and other</u> <u>asbestos manufacturers and sellers and insurers</u> to intentionally misrepresent and suppress relevant information regarding the knowledge of health hazards of asbestos exposure in an effort to injure Plaintiffs.

> 229. <u>Insurers and manufacturers and sellers fraudulently</u> <u>conspired and acted in concert between themselves and</u> <u>other asbestos manufacturers and sellers and insurers</u> to misrepresent and suppress relevant information regarding the knowledge of health hazards of asbestos exposure in an effort to injure Plaintiffs.

(<u>Id.</u> ¶¶ 228-29) (emphasis supplied).[3]

---

[3]Beyond these illustrative allegations, the _Wise I_ initial pleading in its entirety, along with other representative allegations contained therein, leads one to conclude that plaintiffs took strong exception not just to the defendants' actions as to some of their insureds, but as to all of their insureds.  (<u>See</u>, <u>e.g.</u>, _Wise I_ compl. ¶¶ 79, 81, 151-52, 184, 205, 217, 231-32).

The amended complaints take a broader approach.  For example, in the Adams case, instead of focusing on the claims and settlement practices of just five of the defendants' insureds, namely Garlock, Inc., Georgia-Pacific Corp., Owens-Illinois, Inc., Owens-Illinois Glass Company, Inc., and/or the Flintkote Company, the amended pleading seeks recovery for such practices relating to any and all of the defendants' insureds.  The amended complaint, however, also provides as follows:

> 7.    The claims of plaintiffs and class members that were previously unasserted as to certain of defendants' underlying asbestos insureds and that are now being asserted in this amended complaint arise out of the same course of conduct -- namely the specified across-the-board, industry-wide unlawful settlement and claims handling strategies interposed with respect to asbestos personal injury and wrongful death claims -- asserted against those of defendants' underlying asbestos insureds that were named in the original complaints of plaintiffs and class members.

(Adams Am. Compl. ¶ 7).

Throughout their briefing, defendants contend the amended complaints dramatically expanded the litigation.  One representative contention follows:

> [A] recent report of the Rand Institute for Civil Justice estimates that through 2002, some 730,000 asbestos related cases have been filed throughout the country against some 8400 different defendants, and that, for many years, more than 10 percent of these cases were filed in the West Virginia state courts.

(Not. of Remov. ¶ 6).  Based upon these statistics, defendants

11

claim they have been prejudiced by the amendment.  Again, the

<u>Adams</u>' notice of removal is illustrative:

> This [amended complaint] is a far cry from the five
> insureds that formed the basis of the <u>Adams</u> Initial
> Complaint.  This proposed vast expansion of claims and
> the plaintiff class is extremely prejudicial to
> [Continental Casualty Company] [(]CCC[)]. In connection
> with the <u>Adams</u>' Initial Complaint, CCC had determined
> that it never issued any insurance -- and thus could
> not even arguably have committed any UTPA violations --
> with respect to four of the five insureds named in the
> initial Complaint. As to the fifth insured, CCC
> determined that it had issued only very high-level
> excess coverage that had no defense obligation
> effectively negating any real possibility of a
> successful UTPA claim by plaintiffs.  In sharp
> contrast, under the <u>Adams</u> Amended Complaint, CCC would
> be obliged, should a class be certified, to defend
> itself against UTPA claims involving its conduct in
> possibly tens of thousands of West Virginia asbestos
> personal and wrongful death claims involving
> potentially dozens, if not hundreds, of its insureds
> for a period of 25 or more years prior to June 30,2001.
> The prejudice from such a vast increase in the scope of
> the litigation is further exacerbated by the fact that
> it would occur in a case where no discovery has been
> conducted, but where trial is scheduled in 13 months.

(<u>Adams</u> Not. of Remov. ¶ 7).


        In addition to echoing the foregoing arguments by CCC

in <u>Adams</u>, the removing defendants in <u>Wise I</u> and <u>Meninger</u> further

contend plaintiffs have named new defendants in their amended

complaints in those two actions.  The initial complaint in <u>Wise
I</u>, along with a proposed amended complaint that was never filed,

named as a defendant "Liberty Mutual Group, Inc." ("LMG"), an

12

entity that apparently did not even exist at the time it was named.  (<u>Wise I</u> Compl. ¶ 20; Wise I Defs.' Resp. at 3).[4]  The caption of the amended complaint filed in June 2005, however, names "Liberty Mutual Insurance Company" ("LMIC") as the responsible defendant as between the two Liberty entities.  (<u>Wise I</u> Am. Compl. at 1).  Plaintiffs assert a variety of reasons why the amendment should not result in a finding they added a new party.

First, they assert the reason they named LMIC was to correct the errant reference to LMG in the initial <u>Wise I</u> complaint.  Second, they contend LMIC is a corporate sibling of LMG.  Third, they note that LMIC, despite the fact it was not named originally, moved for summary judgment in the case as early as September 2002.

Regarding <u>Meninger</u>, in the initial complaint plaintiffs named OneBeacon Insurance Group ("OIG").  (<u>Meninger</u> Compl. at 1).  The amendment alters this designation, naming OneBeacon America Insurance Company ("OAIC").  (<u>Meninger</u> Am. Compl. at 1).  In sum, plaintiffs assert the amended complaint in the <u>Meninger</u> action

---

[4]This same entity is not found in the caption located on the first page of the initial complaint.  The body of the pleading, however, very clearly identifies LMG as a defendant.

13

"merely corrected the name of OneBeacon to conform to the parties' understanding of the true successor to Commercial Union, OneBeacon America Insurance" Company, "which has been present and participating in the action since 2002."  (Meninger Pls.' Memo. in Supp. of Mot. to Remand at 8-9).  Plaintiffs assert (1) OIG and OAIC are corporate siblings, and (2) OAIC, along with OIG, moved to dismiss in December 2002.  Plaintiffs contend additionally that, in 2003, OAIC moved to enforce an injunction as to Meninger in the United States Bankruptcy Court for the Southern District of New York.

Beyond the issues raised by the four amended complaints, the question of removal jurisdiction is further complicated by the fact that "dozens of insureds . . . are now, or . . . have been[,] reorganized . . . in bankruptcies." (Adams Not. of Remov. ¶ 5; see Wise I Not. of Remov. ¶ 25; Wise II Not. of Remov. at 10; Meninger Not. of Remov. ¶¶ 15-20).

Defendants removed each of the four cases on June 29, 2005.  There are essentially two grounds for removal.  The first ground, alleged in each case, is the Class Action Fairness Act of 2005, Pub. L. 109-2, § 7, 119 Stat. 13 (2005) ("CAFA"). Defendants posit removal is appropriate under CAFA, inter alia, because:

14

[t]he addition of claims based on . . . the . . .
insurers' handling and defense of claims brought
against potentially thousands of asbestos company
defendants, and the commensurate increase in the scope
of the proposed plaintiff class contained in the . . .
Amended Complaint, is the equivalent of commencing a
new action on June 13,2005 for purposes of CAFA. A UTPA
claim in West Virginia is governed by the one-year
statute of limitations contained in West Virginia Code
§ 55-2-12(c).  More than one year has elapsed between
the filing of the . . . Initial . . . [and] Amended
Complaint[s].

Certainly, it cannot be seriously argued that the
new claims and new expanded definition of the plaintiff
class in the . . . Amended Complaint "relate back" to
the filing in 2002 of the . . . Initial Complaint for
statute of limitations purposes.

(Adams Not. of Remov. ¶¶ 10-11 (citations omitted)).  The

defendants in Wise I and Meninger also suggest the change in

parties in those cases supports the view that the amended

complaints commenced the actions anew under CAFA.

Second, the defendants in Adams, Wise II, and Meninger

note both 28 U.S.C. §§ 1452 and 1334(b) grant removal

jurisdiction over civil proceedings related to cases under title

11.[5]  The defendants in these cases contend the consolidated

cases are related to a number of bankruptcy cases, involving some

of their insureds as the debtors, pending throughout the country.

They offer three justifications as to why the consolidated

_____

[5]In Wise I, the defendants have disavowed their reliance on
"related to" jurisdiction as a ground for removal.  (Wise I Memo.
in Oppos. at 19 n.16).

actions are related to the bankruptcy proceedings.  First,
defendants suggest they have contractual rights to
indemnification from the debtors.  Second, they assert their
claims are related to the bankruptcies because they require
extensive discovery from the debtors, which would putatively
"interfere [with] and hinder . . . [the] debtor's reorganization
and thus adversely affect the . . . estate."  (<u>Adams</u> Not. of
Remov. ¶ 22).  Third, defendants contend these WVUTPA actions
violate injunctions entered by some of the affected bankruptcy
courts.


                              II.


A.   CAFA


                        1. Introduction


          CAFA represents a significant shift in the law of
federal subject matter jurisdiction as it relates to class
actions.  A number of defendants in state court actions filed
prior to CAFA's effective date seized the opportunity to benefit
from the new legislation.  One judge observed recently that
"[e]ver since Congress enacted . . . [CAFA,] defendants have been

                              16

trying to remove suits that were pending in state court on
February 18, 2005, although the statute applies only to suits
'commenced' after that date."  <u>Schorsch v. Hewlett-Packard Co.</u>,
417 F.3d 748, 749 (7th Cir. 2005).

Title 28 U.S.C. § 1453(b), a component of CAFA,
provides as follows:

> A class action may be removed to a district court of
> the United States in accordance with section 1446
> (except that the 1-year limitation under section
> 1446(b) shall not apply), without regard to whether any
> defendant is a citizen of the State in which the action
> is brought, except that such action may be removed by
> any defendant without the consent of all defendants.

28 U.S.C. § 1453(b).  CAFA's effective date is critical,
however, for purposes of determining whether a state action is
removable.  CAFA applies to "any civil action commenced on or
after" February 18, 2005.  Class Action Fairness Act (CAFA), § 9,
Pub. L. 109-2, 119 Stat. 4 (2005).

With this background, the court proceeds to the
analysis.

### 2. Burden

Initially, the parties dispute whether CAFA requires
plaintiffs to demonstrate the necessity of remand or, instead,

17

whether defendants are charged with proving up the propriety of removal.  The analysis begins with recognition of the long-settled proposition, espoused repeatedly by our court of appeals, that the proponent of federal jurisdiction bears the burden of demonstrating the legitimacy of its exercise.  <u>See</u>, <u>e.g.</u>, <u>Lontz v. Tharp</u>, 413 F.3d 435, 439 (4th Cir. 2005); <u>Maryland Stadium Auth. v. Ellerbe Becket Inc.</u>, 407 F.3d 255, 260 (4th Cir. 2005); <u>Dixon v. Coburg Dairy, Inc.</u>, 369 F.3d 811, 816 (4th Cir. 2004); <u>Sonoco Prods. Co. v. Physicians Health Plan, Inc.</u>, 338 F.3d 366, 370 (4th Cir. 2003); <u>Mulcahey v. Columbia Organic Chems. Co.</u>, 29 F.3d 148, 151 (4th Cir. 1994).

Defendants contend that CAFA altered this longstanding rule.  They cite not CAFA itself, but instead rely primarily upon language found in Senate Report 109-14.  Although they do not specify the language therein supporting their position, their pinpoint citation is to page 43, which provides pertinently as follows:

> Overall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions. Its provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.  As noted above, it is the intent of the Committee that the named plaintiff(s) should bear the burden of demonstrating that a case should be remanded to state court (e.g., the burden of demonstrating that more than two-thirds of the proposed class members are

18

> citizens of the forum state). Allocating the burden in
> this manner is important to ensure that the named
> plaintiffs will not be able to evade federal
> jurisdiction with vague class definitions or other
> efforts to obscure the citizenship of class members.

S. Rep. No. 109-14, at 43 (2005), <u>as reprinted in</u> 2005

U.S.C.C.A.N. 3, 41.[6]

        Surprisingly, the lower courts are split on whether

this committee report altered the burden of demonstrating the

propriety of exercising subject matter jurisdiction.  The only

superior tribunal to date that has squarely addressed the

question is the United States Court of Appeals for the Seventh

Circuit.  Judge Easterbrook, writing for a panel composed

additionally of Judges Posner and Rovner, offers a compelling

analysis as to why the burden has not shifted:

> Countrywide maintains that the Class Action Fairness
> Act reassigns th[e] burden to the proponent of remand.
> It does not rely on any of the Act's language, for none
> is even arguably relevant. Instead it points to this
> language in the report of the Senate Judiciary
> Committee: "If a purported class action is removed
> pursuant to these jurisdictional provisions, the named
> plaintiff(s) should bear the burden of demonstrating
> that the removal was improvident (i.e., that the
> applicable jurisdictional provisions are not
> satisfied)." S. Rep. 14, 109th Cong. 1st Sess. 42
> (2005). This passage does not concern any text in the
> bill that eventually became law. When a law sensibly

---

        [6]As noted within, there is additional language even more
supportive of defendants' position at page 42 of the committee
report.

could be read in multiple ways, legislative history may
help a court understand which of these received the
political branches' imprimatur. But when the
legislative history stands by itself, as a naked
expression of "intent" unconnected to any enacted text,
it has no more force than an opinion poll of
legislators -- less, really, as it speaks for fewer.
Thirteen Senators signed this report and five voted not
to send the proposal to the floor. Another 82 Senators
did not express themselves on the question; likewise
435 Members of the House and one President kept their
silence.

We recognize that a dozen or so district judges
have treated this passage as equivalent to a statute
and reassigned the risk of non-persuasion accordingly.
But naked legislative history has no legal effect, as
the Supreme Court held in <u>Pierce v. Underwood</u>, 487 U.S.
552, 566-68, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). A
Committee of Congress attempted to alter an established
legal rule by a forceful declaration in a report; the
Justices concluded, however, that because the
declaration did not correspond to any new statutory
language that would change the rule, it was
ineffectual. Just so here. The rule that the proponent
of federal jurisdiction bears the risk of
non-persuasion has been around for a long time. To
change such a rule, Congress must enact a statute with
the President's signature (or by a two-thirds majority
to override a veto). A declaration by 13 Senators will
not serve.

<u>Brill v. Countrywide Home Loans, Inc.</u>, 427 F.3d 446, 448 (7th

Cir. 2005).

The court adopts the <u>Brill</u> holding and analysis in its

entirety.  At a minimum, the holding is certainly consistent with

how one would expect our court of appeals to resolve the issue.

<u>See</u> <u>Rosmer v. Pfizer Inc.</u>, 263 F.3d 110, 117 (4th Cir. 2001) ("It

is 'the statute, and not the Committee Report, which is the authoritative expression of the law.'") (quoting <u>City of Chicago v. Envtl. Def. Fund</u>, 511 U.S. 328, 337 (1994)). Congress was no doubt aware of the time-honored principle that the proponent of federal jurisdiction bears the attendant obligation of proving its necessary prerequisites. If a different result was intended with the passage of CAFA, one would expect that landmark piece of legislation to have provided at least some textual indication it was altering what can only be described as a bedrock principle of federal jurisdiction. Absent such an explicit indicator, the burden remains with defendants to demonstrate the propriety of removal under CAFA.

### 3. Commencement of the Action

As noted, CAFA is inapplicable to actions "commenced" prior to its February 18, 2005, effective date. Few courts since CAFA's enactment have had occasion to interpret what Congress meant by the term "commenced." A majority of the available circuit opinions address only the question of whether "commenced" refers to the date an action was instituted in state court or, instead, the date of removal. That narrow question is easily answered. <u>See</u>, <u>e.g.</u>, <u>Bush v. Cheaptickets, Inc.</u>, 425 F.3d 683,

686 (9th Cir. 2005) ("[G]iven its context, CAFA's 'commenced'
language surely refers to when the action was originally
commenced in state court" rather than the date of removal);
Natale v. Pfizer, Inc., 424 F.3d 43, 44 (1st Cir. 2005);
Pritchett v. Office Depot, Inc., 420 F.3d 1090, 1094 (10th Cir.
2005); Pfizer, Inc. v. Lott, 417 F.3d 725, 726 (7th Cir. 2005).[7]

        The term "commence" is susceptible to a common, bright-
line interpretation.  In its purest form, the term means "to
initiate formally by performing the first act of (~legal
proceedings)."  Webster's Third New International Dictionary 456
(3rd ed. 1981).  When a complaint is amended, it is usually
difficult to conceive of the action beginning anew.  Instead, one
observes that a change has been wrought in a case already begun.

---

[7]Although the holdings in these cases are not particularly
helpful here, some elements of their underlying reasoning are
instructive.  For example, Bush noted the appeal of a bright-line
interpretation of "commenced[:]"

    Cheaptickets would have us read "commenced" to mean
    "when removed." That construction makes unnecessarily
    complex what appears to be a very simple provision and
    statutory scheme. Had Congress wished to permit the
    removal of state suits removed after February 18, 2005,
    it could have provided that "the amendments made by
    this Act shall apply to any court action removed on or
    after the date of enactment of this Act." Cheaptickets
    would have us give Section 9 an even more awkward
    construction, permitting the removal of any civil
    action commenced or removed on or after the date of
    enactment.

Bush, 425 F.3d at 687 (emphasis supplied).

As one will see from the prolonged discussion that follows, the question of whether an amendment gives rise to a second beginning can be quite thorny and dependent upon widely diverging representations of the parties concerning the effect and intention of the amendment.  This type of muddled and protracted inquiry is generally inconsistent with our court of appeals' stated desire of avoiding a quagmire when attempting to ascertain the existence of subject matter jurisdiction.  As noted by Judge Wilkinson, writing for the panel in <u>Hartley v. CSX Transp., Inc.</u>, 187 F.3d 422 (4th Cir. 1999), "a jurisdictional inquiry is not the appropriate stage of litigation to resolve . . . various uncertain questions of law and fact. . . . Jurisdictional rules direct judicial traffic. They function to steer litigation to the proper forum with a minimum of preliminary fuss." <u>Id.</u> at 425.  Nevertheless, the effect of a given amendment must be analyzed to determine whether it constitutes a new beginning.

The United States Court of Appeals for the Seventh Circuit has suggested an amendment could result in an action being commenced anew for purposes of CAFA.  <u>Schorsch v. Hewlett-Packard Co.</u>, 417 F.3d 748, 749 (7th Cir. 2005).  The United States Court of Appeals for the Eighth Circuit has

23

followed this same approach.   Plubell v. Merck & Co., Inc., 434
F.3d 1070, 1071-72 (8th Cir. 2006).  From strictly an appellate
perspective, the analysis is illustrated by a trilogy of Seventh
Circuit cases.  The progression began in Knudsen v. Liberty Mut.
Ins. Co., 411 F.3d 805 (7th Cir. 2005):

> Instead of arguing that removal equals
> "commencement," Liberty Mutual contends that any
> substantial change to the class definition "commences"
> a new case. Now as a matter of normal language (and
> normal legal practice) a new development in a pending
> suit no more commences a new suit than does its
> removal. Plaintiffs routinely amend their complaints,
> and proposed class definitions, without any suggestion
> that they have restarted the suit -- for a restart
> (like a genuinely new claim) would enable the defendant
> to assert the statute of limitations. Liberty Mutual
> concedes that routine changes do not allow removal but
> insists that a "substantial" or "significant" change
> must do so. Yet significance is not the measure of a
> new claim; a plaintiff may assert an entirely novel
> legal theory in midsuit without creating a "new" claim
> in the sense that the defendant could block it by
> asserting that it had been propounded after the period
> of limitations expired. Moreover, "significance" often
> lies in the eye of the beholder; it is not a rule of
> law so much as it is a cast of mind or an assessment of
> likely consequences, which may be difficult if not
> impossible to foresee. A doctrine of "significant
> change" thus would go against the principle that the
> first virtue of any jurisdictional rule is clarity and
> ease of implementation.

Id. at 806.  The court of appeals, however, went on to discuss
how a removing defendant might demonstrate otherwise:

> Liberty Mutual paints a picture of crafty lawyers
> tending a garden of pre-2005 class actions, in which
> they plant new claims by amendment so that the 2005 Act
> never comes into play. As we have already hinted,

however, a new claim for relief (a new "cause of
action" in state practice), the addition of a new
defendant, or any other step sufficiently distinct that
courts would treat it as independent for limitations
purposes, could well commence a new piece of litigation
for federal purposes even if it bears an old docket
number for state purposes. Removal practice recognizes
this point: an amendment to the pleadings that adds a
claim under federal law (where only state claims had
been framed before), or adds a new defendant, opens a
new window of removal. 28 U.S.C. § 1446(b).  We
imagine, though we need not hold, that a similar
approach will apply under the 2005 Act, perhaps modeled
on Fed.R.Civ.P. 15(c), which specifies when a claim
relates back to the original complaint (and hence is
treated as part of the original suit) and when it is
sufficiently independent of the original contentions
that it must be treated as fresh litigation.  This
possibility does Liberty Mutual no good, however,
<u>because the change in class definition does not present
a novel claim for relief or add a new party</u>.

<u>Id.</u> at 807 (emphasis supplied).


        The plaintiffs in <u>Knudsen</u> originally proposed a class

of "all LIBERTY insureds, their third party beneficiaries and

their assignees who are entitled to payment of medical bills

under any medical payments coverages pursuant to a LIBERTY

insurance policy . . . ."  The complaint defined "LIBERTY" as

Liberty Mutual Insurance Company, the sole defendant.  Liberty

Mutual responded that plaintiffs could not represent this class

because their claims derived from policies issued by Liberty

Mutual Fire Insurance Company.  Plaintiffs then moved after the

enactment of CAFA to amend the class to include "[a]ll Liberty

Mutual Insurance Company and Liberty [Mutual] Fire Insurance

Company insureds . . . ."  The Seventh Circuit found this

amendment curious because Liberty Mutual Fire Insurance Company

was a non-party.  The court went on to hold as follows:

> If in the future Liberty Mutual Fire Insurance Company
> should be added as a defendant, it could enjoy a right
> to remove under the 2005 Act, for suit against it would
> have been commenced after February 18, 2005. But
> Liberty Mutual Insurance Company cannot remove five
> years after this suit was commenced just because a
> nonparty corporate sibling has been mentioned in
> plaintiffs' latest papers.

Id. at 807-08.


     The next discussion of the issue is Schorsch v.

Hewlett-Packard Co., 417 F.3d 748 (7th Cir. 2005), which, like

Knudsen, postulated that while

> "a routine amendment to the complaint does not commence
> a new suit[,]" some "[a]mendments could in principle
> initiate litigation . . .: a defendant added after
> February 18 could remove because suit against it would
> have been commenced after the effective date, and
> tacking a wholly distinct claim for relief onto an old
> suit likewise might commence a new proceeding."

Id. at 749 (emphasis supplied)(quoted authority omitted).  The

underscored language suggests the importance of comparing the

factual and legal predicates for the initial action with those

achieved by amendment.  In Schorsch, those facts were as follows:

> Schorsch filed suit in Illinois in 2003, proposing to
> represent a class of persons who purchased from HP drum
> kits for use in its printers.  [When a drum kit begins

26

to expire] [f]irst the printer warns the customer that
[it] needs replacing. After a given number of
additional pages have been printed, an EEPROM chip
tells the printer to stop working until a new drum kit
has been installed. . . . Schorsch contends that this
cutoff injures consumers who want to press their luck
or accept lower-quality output at the end of a drum
kit's life cycle. . . .

In May 2005 Schorsch tendered a proposed
second amended complaint that would expand the class
from purchasers of drum kits to purchasers of all
printer consumables that contain EEPROM chips. Schorsch
believes that HP's toner cartridges (for laser
printers) and ink cartridges (for ink-jet printers)
also contain EEPROMs. HP then removed the proceeding to
federal court, contending that this expansion of the
class commenced a new suit.

Schorsch, 417 F.3d at 749-50.

The panel in Schorsch first observed that the rule of

decision for commencement purposes under CAFA was supplied by

state law.  See Schorsch, 417 F.3d at 750 ("Although we used

Fed.R.Civ.P. 15(c) in Knudsen to illustrate the difference

between claims that relate back and those that do not (and so may

be treated as commenced when added to the suit), state rather

than federal practice must supply the rule of decision.").

The panel then offered some common-sense observations

concerning the nature of the litigation:

From its outset, this suit has been about HP's use
of EEPROM chips to shut down its printers until a
component has been replaced. Identity of the consumable
is a detail. HP tells us that its toner cartridges and
ink cartridges do not contain EEPROM chips, and if so
then the change in the proposed definition has no

27

effect beyond making notice to the class a little more costly. But let us assume that Schorsch is right. <u>This is still just one suit, between the original litigants. Litigants and judges regularly modify class definitions</u>; <u>Knudsen</u> holds that such changes do not "commence" new suits.

HP insists that this change does, because litigation based on EEPROM chips in toner or ink cartridges is so different from litigation based on EEPROM chips in drum kits that the second amended complaint does not relate back to the first. On that view two periods of limitation apply: one (for drum kits) measured from the original complaint in October 2003, and the other (for cartridges) measured from the proposed amendment in May 2005. That would be the sort of addition that, we <u>conjectured</u> in <u>Knudsen</u>, <u>might</u> "commence" a new action. But HP does not really believe this. <u>It removed the whole suit, not just the claim based on cartridges -- though its theory of removal supposes that Schorsch commenced a piece of litigation distinct from the drum-kit claim. Likely the reason HP tried to remove the whole shebang is that drum kits and cartridges are consumables for printers made by one firm and subject to one set of legal rules; it would be silly to handle drum kits in state court and toner or ink cartridges in federal. Yet to say this is effectively to say that there is only one "claim" to begin with</u>.

<u>Schorsch</u>, 417 F.3d at 750 (emphasis supplied).

After noting that the applicable state law was practically co-extensive with the relation-back principles contained in Federal Rule of Civil Procedure 15(c), the court of appeals further analyzed the matter:

It is apt to describe the challenged "transaction" as HP's inclusion in consumables of chips that cause printers to stop working before the consumer has wrung the last iota of use from the product. HP has not cited

28

> any case, in either Illinois or federal court, treating
> a similar amendment to the class definition as
> commencing a new proceeding.
>
> An amendment relates back in Illinois when the
> original complaint "furnished to the defendant all the
> information necessary . . . to prepare a defense to the
> claim subsequently asserted in the amended complaint."
> The October 2003 complaint did this. The propriety of
> using EEPROM chips is an all-or-none affair; HP has not
> suggested any way in which it might be entitled to
> implement end-of-life rules for drum kits but not
> cartridges, or the reverse. It does not contend, for
> example, that it informed consumers of one but not the
> other, or that it solicited purchasers' consent with
> respect to one but not the other.

Schorsch, 417 F.3d at 751.

Not long after Schorsch, the Seventh Circuit handed
down its third opinion dealing with a post-CAFA amendment to an
existing state action.  In Schillinger v. Union Pacific R. Co.,
425 F.3d 330 (7th Cir. 2005), the Schillingers, on behalf of the
class of similarly situated property owners, instituted an action
against Union Pacific Corporation (UPC) and Union Pacific
Railroad Company (UPRR) on June 7, 2002.  They contended that the
companies, which ostensibly enjoyed a right-of-way over class
lands, committed trespass and were unjustly enriched by leasing
the land to certain telecommunications providers.  After an
initial, unsuccessful removal attempt by defendants, plaintiffs
voluntarily dismissed UPC after learning it neither operated a
railroad nor owned any right-of-way.

29

In May 2003, the Schillingers then moved to amend by expanding the proposed class to include those property owners nationwide who owned land over which UPRR enjoyed a right-of-way. Further, although already dismissed, plaintiff mistakenly listed UPC as a party due to a scrivener's error.  In May 2005, the state court granted the motion to amend.  UPRR and UPC then removed the case under CAFA, asserting the action "commenced" anew with the amended complaint in view of the fact that a new defendant was added and the class definition expanded.

Regarding the addition of a new party, the panel observed that, "in general, 'a defendant added after February 18 [2005] could remove [under CAFA] because suit against it would have been commenced after the effective date[.]'"  Id. at 333 (quoting Schorsch, 417 F.3d at 749) (citing Knudsen, 411 F.3d at 807).  It was additionally observed, however, that the erroneous naming of UPC did not amount to the addition of a new party sufficient to invoke CAFA.  Important for present purposes is the court's accompanying analysis: "This case should not come to federal court if the only ground for jurisdiction is a clerical error, however careless. . . . [J]urisdiction is defeated if one of the pleading elements necessary to establish jurisdiction is a scrivener's error."  Id. at 333-34.

Regarding the expanded class definition, the panel observed additionally as follows:

> After the amendments to the complaint, however, <u>this suit is still between the Schillingers and others similarly situated (whomever that may turn out to include) and UPRR, and it concerns the same claim alleged in the original complaint</u>. As <u>Schorsch</u> explains, the expansion of a proposed class does not change the parties to the litigation nor does it add new claims. 417 F.3d at 750.
>
> Recognizing that plaintiffs' amendment did not add any parties or add a new claim, the companies contend instead that the expansion was a "step sufficiently distinct that courts would treat it as independent for limitations purposes" and accordingly it commenced a new piece of litigation under CAFA. <u>See</u> <u>Knudsen</u>, 411 F.3d at 807.  This is the same argument that Hewlett-Packard advanced and this court rejected in <u>Schorsch</u>. In that case, plaintiff expanded the proposed class from consumers of one computer-printer product that contained an allegedly faulty chip to consumers of two other computer-printer products that contained the same allegedly faulty chip. <u>The original complaint furnished Hewlett-Packard with the information necessary to defend against the amended complaint, this court held, and as a result the amendment would relate back to the original complaint for Illinois statute-of-limitation purposes</u>. This also implies that the amendment did not commence a new action under CAFA. <u>Schorsch</u>, 417 F.3d at 750-51.
>
> We acknowledge that the Schillingers' expansion of the class (if successful) may have greater repercussions for UPRR than Hewlett-Packard potentially faced in its litigation. If plaintiffs' nationwide class is eventually certified, UPRR will have more rights-of-way to research and more state laws under which to analyze various claims than if it was facing only a class of Illinois plaintiffs. But, as we explained in <u>Schorsch</u> and <u>Knudsen</u>, <u>the potential for a larger amount of legal research and discovery in and of</u>

31

><u>itself is not a significant enough step to create new litigation</u>.

<u>Id.</u> at 334 (emphasis supplied).

With these principles in mind, the court turns to an examination of when an action commences under West Virginia law and also when an amendment to a complaint results in a new action or, alternatively, relates back to the original institution of the litigation.

The first question is answered readily upon review of West Virginia Rule of Civil Procedure 3(a): "A civil action is commenced by filing a complaint with the court."  The answer to the second question is decidedly more involved.  Rule 15(c), West Virginia Rule of Civil Procedure, provides as follows:

>An amendment of a pleading relates back to the date of the original pleading when:
>
>>(1) relation back is permitted by the law that provides the statute of limitations applicable to the action; or
>>
>>(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; or
>>
>>(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing paragraph (2) is satisfied and, within the period provided by Rule 4(k) for service of the summons and

32

> complaint, the party to be brought in by
> amendment (A) has received such notice of the
> institution of the action that the party will
> not be prejudiced in maintaining a defense on
> the merits, and (B) knew or should have known
> that, but for a mistake concerning the
> identity of the proper party, the action
> would have [been] brought against the party.

W. Va. R. Civ. Proc. 15(c).

The most recent, authoritative discussion of West
Virginia Rule 15(c) is found in <u>Brooks v. Isinghood</u>, 213 W. Va.
675, 584 S.E.2d 531 (2003).  Analysis of <u>Brooks</u> begins with its
recognition of the principle that

> Rule 15, by its own terms, is to be construed liberally
> in order to promote the consideration of claims on
> their merits. . . . 'The goal behind Rule 15, as with
> all the Rules of Civil Procedure, is to insure that
> cases and controversies be determined upon their merits
> and not upon legal technicalities or procedural
> niceties.'"

<u>Id.</u> at 684, 584 S.E.2d at 540 (citations omitted).  At the same
time, the supreme court of appeals noted that "Rule 15(c) imposes
restrictions in deference to the equally important purposes of
the statute of limitations."  <u>Id.</u> at 684, 584 S.E.2d at 540.

In syllabus point 4 of <u>Brooks</u>, the West Virginia court
set forth the test for determining whether the addition of a new
party would relate back to the filing date of the original
complaint:

> Under Rule 15(c)(3) of the West Virginia Rules of
> Civil Procedure [1998], an amendment to a complaint

33

changing a defendant or the naming of a defendant will relate back to the date the plaintiff filed the original complaint if: (1) the claim asserted in the amended complaint arose out of the same conduct, transaction, or occurrence as that asserted in the original complaint; (2) the defendant named in the amended complaint received notice of the filing of the original complaint and is not prejudiced in maintaining a defense by the delay in being named; (3) the defendant either knew or should have known that he or she would have been named in the original complaint had it not been for a mistake; and (4) notice of the action, and knowledge or potential knowledge of the mistake, was received by the defendant within the period prescribed for commencing an action and service of process of the original complaint.

Syl. pt. 4, <u>id.</u> at 678-79, 584 S.E.2d at 534-35.  The West Virginia court also provided a series of additional syllabus points to inform the inquiry:

> 7. Under Rule 15(c)(3)(B) of the West Virginia Rules of Civil Procedure [1998], a "mistake concerning the identity of the proper party" can include a mistake by a plaintiff of either law or fact, so long as the plaintiff's mistake resulted in a failure to identify, and assert a claim against, the proper defendant. A court considering whether a mistake has occurred should focus on whether the failure to include the proper defendant was an error and not a deliberate strategy.

> 8. "Where a plaintiff seeks to change a party defendant by a motion to amend a complaint under Rule 15(c) of the West Virginia Rules of Civil Procedure, the amendment will relate back to the filing of the original complaint only if the proposed new party defendant, prior to the running of the statute of limitations, received such notice of the institution of the original action that he will not be prejudiced in maintaining his defense on the merits and that he knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him." Syllabus, <u>Maxwell v. Eastern</u>

34

<u>Associated Coal Corp., Inc.</u>, 183 W.Va. 70, 394 S.E.2d 54 (1990).

9. Under the 1998 amendments to Rule 15(c)(3) of the West Virginia Rules of Civil Procedure, before a plaintiff may amend a complaint to add a new defendant, it must be established that the newly-added defendant (1) received notice of the original action and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the newly-added defendant, prior to the running of the statute of limitation or within the period prescribed for service of the summons and complaint, whichever is greater. To the extent that the Syllabus of <u>Maxwell v. Eastern Associated Coal Corp.</u>, 183 W.Va. 70, 394 S.E.2d 54 (1990) conflicts with this holding, it is hereby modified.

<u>Id.</u> at 679, 584 S.E.2d at 535.

Regarding the necessity of the original and amended pleadings growing out of the same conduct, transaction, or occurrence, the supreme court of appeals noted as follows:

The first requirement under Rule 15(c)(3) is that the amendment must arise out of the conduct, transaction or occurrence set forth in the original complaint. [FN7] There is no dispute that the claim or defense to be asserted by the appellant in the amended complaint arises out of the same occurrence, the collapse of the trench, as that contained in the original complaint that she filed in the circuit court in April 1995. <u>See</u>, <u>e.g.</u>, <u>Roberts v. Wagner Chevrolet-Olds, Inc.</u>, 163 W.Va. 559, 563, 258 S.E.2d 901, 903 (1979) (courts, analyzing whether an amendment to a pleading relates back, "have generally found relation back where the amendments state a cause of action <u>growing out of the specified conduct of the defendant which gave rise to the original cause of action</u>.").

FN7. One treatise gives the following examples where an amendment arises out of the same conduct, transaction or occurrence set

35

> forth in the original complaint:
>
> Courts also allow relation back when the new claim is based on the same facts as the original pleading and only changes the legal theory.
>
> Amendments that amplify or restate the original pleading or set forth facts with greater specificity should relate back. . . .

Id. at 685 and n.7, 584 S.E.2d at 541 and n.7 (emphasis supplied).

Regarding the required notice, the supreme court of appeals suggested that if a change is made in parties or legal theories, the court should always examine the "'injustice to the adverse party'" if relation back is allowed, along with whether the party "'has received adequate notice of the claim against him and has an adequate opportunity to prepare a defense to it.'" Id. at 686, 584 S.E.2d at 542.  The court further noted, however, that there was no talismanic formula accompanying the required notice: "While Rule 15(c)(3) of the West Virginia Rules of Civil Procedure . . . requires that a party to be brought in by amendment receive notice of the institution of the original action, the form of the notice may be either formal or informal, and does not require service of the original complaint or summons upon the party affected by the amendment."  Id. at 679, 584 S.E.2d at 535.  The supreme court of appeals expanded upon this

36

issue further:

> Notice may be adequate, and relation back would not be
> prejudicial, if there is a sufficient "identity of
> interest" between the new party added by an amendment
> and the original one. In Syllabus Point 2 of <u>Plum v.
> Mitter</u>, 157 W.Va. 773, 204 S.E.2d 8 (1974), we
> indicated that courts should consider "whether there is
> an 'identity of interest' between the original party
> plaintiff and the added parties" when assessing motions
> to add new plaintiffs under Rule 15. We did not,
> however, define what an "identity of interest" might
> be.
>
> The classic definition of identity of interest is
> where the original and new party are so intertwined in
> their affairs, business operations or other activities
> that it is fair to conclude that the added party
> learned early on of the commencement of the original
> action.

<u>Id.</u> at 687 n.10, 584 S.E.2d at 543 n.10.  The West Virginia court

further observed as follows:

> [T]he same attorneys who represented the City of
> Weirton prior to its dismissal now represent the
> appellee employees of the City; the attorneys would
> therefore have a difficult time in claiming, and in
> fact do not complain, that their defense of the
> appellant's claims have been prejudiced because of some
> deficiency in the notice or timing thereof that she
> received. [FN11]
>
>> FN11. Notice can be imputed to a new party if
>> the new party shares legal counsel with the
>> original party after the filing of the
>> original pleading, because it is likely that
>> the parties' attorney would have communicated
>> to the new party that he or she may be joined
>> in the action.

<u>Id.</u> at 687 n.11, 584 S.E.2d at 543 n.11.

Regarding the requirement that the mistake relate to
the identity of the proper party, the West Virginia court
observed "A court considering whether a mistake has occurred
should focus on whether the failure to include the proper
defendant was an error and not a deliberate strategy."
Id. at 690, 584 S.E.2d at 546.

In view of the fact that two of the consolidated cases
involve amended complaints that putatively added parties, the
court undertakes to determine not only whether the claims
asserted in the four amended complaints arose out of the same
conduct, transaction, or occurrence as that asserted in the
original complaints, but also the outcome of the remainder of the
analysis concerning the effect of the added parties in Wise I and
Meninger.

First, the court examines whether the claim asserted in
the amended complaints arises out of the same conduct,
transaction, or occurrence as that asserted in the initial
complaints.  In Brooks, the supreme court of appeals observed
that this standard is satisfied in situations where amendments
state a claim growing out of the conduct of the defendants which
gave rise to the original litigation.  In reading the initial or
amended complaints, one is struck at once by the fact that the

same claims and theories are presented in both.  Stripped of the minutiae, plaintiffs allege the defendants knew that the defenses they were asserting to asbestos personal injury and wrongful death claims were unfounded across the board, that this misconduct harmed plaintiffs, and that it is actionable under the WVUTPA.  The legal theory in the amended pleadings is identical to that found in the initial complaints.  The claims, parties, and core factual issues remain the same.

Regarding LMIC and OAIC, plaintiffs contend these defendants were added in the amended complaints to correct errant references to similarly named entities.  Defendants do not suggest plaintiffs gained any advantage from changing the errant references.  Further, as noted in Schillinger, a "case should not come to federal court if the only ground for jurisdiction is a clerical error, however careless. . . . [J]urisdiction is defeated if one of the pleading elements necessary to establish jurisdiction is a scrivener's error."  Schillinger, 425 F.3d at 334.

Moving to the remaining considerations under Brooks, despite the fact these entities were not originally named, they had involvement in the actions long before their formal addition. For example, both entities filed, or apparently caused to be

39

filed, dispositive motions before being joined.  Given this joint

defense activity "it is fair to conclude that the added part[ies]

learned early on of the commencement of the original action[,]"

perhaps through common counsel, and that no prejudice resulted to

either of them.  Id. at 687 n.10, 584 S.E.2d at 543 n.10.[8]

          To the extent notice and prejudice are even relevant

with respect to any of the defendants other than LMIC and OAIC,

the remaining parties have not shown they are seriously

---

[8]LMIC makes two contentions that are worthy of further
consideration.  First, LMIC asserts that while it promptly
advised plaintiffs after the filing of the initial complaint that
it, not LMG, was the only conceivable Liberty defendant that
might be a proper party, plaintiffs ignored the advice and again
named LMG, and not LMIC, in their proposed amended complaint in
November 2002 that was never filed. Second, LMIC asserts that
while LMG was sued only on successor liability grounds in the
initial complaint, the June 2005 amended complaint sued LMIC
directly.
     Regarding the first contention, LMIC appears to contend that
it putatively concluded after viewing the November 2002 proposed
amended complaint that plaintiffs had no intention of pursuing a
claim against it.  That contention, however, was unwarranted.  It
was more likely the case that plaintiff intended to pursue some
Liberty defendant throughout but mistakenly referenced LMG again
in the November 2002 proposed amended complaint.  LMIC concedes
as much, stating later in its briefing as follows: "What
plaintiffs were suing some 'Liberty Mutual' company for has
always been obscure."  (Wise I Defs.' Resp. at 11.)
     As to the second contention, it is of little moment whether
the suit is based upon successor or direct liability.  What is
significant is Liberty's own recognition that plaintiffs sought
to hold it accountable in some fashion as early as the filing of
the initial complaint.  LMIC had notice that, but for the LMG
error, LMIC would have been included amongst those insurers whom
plaintiffs claim violated West Virginia law.

disadvantaged in any way.  Regarding notice, defendants contend
they could not have anticipated the expansion achieved by the
June 2005 amended complaint that sought recovery for defendants'
putative misconduct relating to all, as opposed to just some, of
their insureds.  This argument, however, ignores the previously
noted language of the original complaints.  A representative
example of the language from the initial Adams' pleading appears
below:

> 41.  In response to the mounting asbestos problem,
> and despite their extensive and long-standing knowledge
> of the hazards of asbestos, defendants joined with
> other insureds and companies facing asbestos-related
> claims to formulate claims settlement strategies aimed
> at limiting and/or avoiding the "catastrophic"
> liability problem posed by these claims, including such
> claims against Garlock, Inc., Georgia-Pacific Corp.,
> Owens-Illinois, Inc., Owens-Illinois Glass Company,
> Inc., and/or The Flintkote Company.

(Adams Pls.' Mem. in Supp. of Remand at 4-5 (quoting Compl. ¶
41)(emphasis supplied).  The words "including" and "insureds" are
also used repeatedly in paragraphs 42, 43, and 44 of the initial
Adams complaint and at various points in the initial complaints
in Wise II and Meninger.  Further, as noted, the three initial
complaints in the other consolidated actions also mention only
certain insureds by name.  Like the Adams' complaint, language in
each appears directed to defendants' joint misconduct with all of

41

their insureds generally.[9]

This language alerts an attentive reader that additional action is contemplated against other, then-unnamed insureds.  The defendants might have taken the broad-based allegations in these initial pleadings as ominous signs of an intention to perhaps later broaden the litigation to include defendants' alleged misconduct relating to all of their respective insureds.[10]

_____

[9](See, e.g., Wise I compl. ¶¶ 79, 81, 151-52, 184, 205, 217, 228, 229, 231-32; Wise II compl. ¶¶ 2, 40-43, 48, 54, 60, 64, 69); Meninger compl. ¶¶ 2, 24, 27-30, 34, 40, 46, 50, 55).

[10]The Adams defendants challenge this notion.  They assert that after plaintiffs filed the first consolidated action, Wise I, they filed the second, third, and fourth actions solely for purposes of naming new insureds.  The Adams defendants thus contend that they never deemed the inclusive language of the first four pleadings to extend beyond the specific insureds named therein.  They in essence assert they were lulled into a belief that when new insureds were to be sued, plaintiffs would file a new action.  The argument fails for at least two reasons.  First, plaintiffs might simply have been employing a dual strategy of filing some additional actions, cognizant of the fact that their broad-based language in the initial pleadings could be relied upon if the serial filing of actions became too cumbersome.  Second, and again assuming the relation-back test permits inquiry into prior notice and resultant prejudice when no new party is added, the test does not require that defendants possess absolute certainty concerning a plaintiff's intentions.  It simply requires notice.  The all-inclusive scope of the initial complaints provided notice to defendants that plaintiffs, despite their choice of discrete insureds, had reason to include a future assault within these cases against any responsible insurer based upon perceived misconduct.

42

Regarding prejudice, CCC contends that it had very limited potential liability under the initial complaint, now greatly expanded under the amended pleading. CCC asserts this action has been transformed into one requiring it to defend its actions in "possibly tens of thousands of West Virginia asbestos personal and wrongful death claims involving potentially dozens, if not hundreds, of its insureds for a period of 25 or more years prior to June 30, 2001." (Adams Not. of Remov. ¶ 7). What defendants overlook, however, is the fact plaintiffs bear the burden of proof in the joint action. It is unlikely at best that plaintiffs would, faced with such a prospect, approach the litigation in the unmanageable and costly way posited by defendants' scenario. This is especially so given the tight time line imposed in state court.

True, the potential liability of CCC and some other insurers is broader as a result of the amended complaints. The court cannot conclude that such broader liability, however, equates with prejudice sufficient to deny relation back. The court has confidence neither the plaintiffs, nor indeed the state court, would allow this action to become as unwieldy as suggested by defendants. Indeed, class certification might well ultimately be denied or withdrawn if significant factual variances or

43

manageability problems arise.[11]

In sum, defendants' arguments concerning a lack of notice and resultant prejudice are not well taken.  Further, both LMIC and OAIC received notice of the initial complaint and knew or should have known that, but for a mistake concerning their identities, the actions would have been brought against them prior to the running of the statute of limitation or within the period prescribed for service of the summons and complaint, whichever would be deemed greater.[12]  Under West Virginia law, then, the court would deem the amended complaints to relate back pursuant to state Rule 15(c).  See Phillips v. Ford Motor Co., 435 F.3d 785, 787 (7th Cir. 2006) ("The clearest case in which an amended complaint does not kick off a new suit is where the amendment 'relates back' to the original complaint.").

---

[11]Defendants additional assertion of prejudice from Judge Bloom's thirteen-month time line cuts both ways.  This provides the defense less time than it would like to prepare, but it also places plaintiffs in the extraordinary position of having to assemble a very complex case for trial in a comparatively short period of time.  Indeed, the increased scope of the case might redound ultimately to defendants' advantage.

[12]As noted, defendants bear the burden of demonstrating the propriety of removal jurisdiction.  The analysis is further simplified by their failure to discuss at any length the complex question surrounding the applicable limitations period.

44

Beyond <u>Brooks</u>, however, <u>Knudsen</u>, <u>Schillinger</u>, and <u>Schorsch</u> foreshadow the appropriate result here.  First, <u>Knudsen</u> observed that an amended complaint commences a new action under CAFA when ""when it is sufficiently independent of the original contentions that it must be treated as fresh litigation."  <u>Knudsen</u>, 411 F.3d at 807.  A comparison of the initial and amended complaints makes clear that the latter cannot be characterized as "fresh litigation."[13]

Similarly, <u>Schorsh</u> noted that "[f]rom its outset, this suit has been about HP's use of EEPROM chips to shut down its printers until a component has been replaced. Identity of the consumable is a detail."  <u>Schorsch</u>, 417 F.3d at 750.  So, too, in

---

[13]Defendants cite the very recent decision in <u>Knudsen v. Liberty Mutual Insurance Co.</u>, 435 F.3d 755 (7th Cir. 2006) ("<u>Knudsen II</u>").  Following the decision in <u>Knudsen</u>, the case was remanded to state court.  On remand, plaintiffs amended the class definition, seeking to hold "Liberty Mutual responsible for all policies issued by any subsidiary or affiliate, about 35 firms in all."  <u>Knudsen II</u>, 435 F.3d at 756.  The court of appeals found that the amended class definition initiated new claims because Liberty Mutual Insurance Company did not adjust all demands for payment against all of its affiliates.

In contrast, plaintiffs in the consolidated actions have not initiated any new claims.  Further, they are not pursuing a nationwide class action.  Also, the three-page panel opinion was implicitly concerned about the fairness of the state court's actions on remand, noting one ruling that granted default judgment against Liberty Mutual Insurance Company, "leaving only damages for consideration."  <u>Id.</u> at 756.  <u>Knudsen II</u> is of little utility here.

45

this action.  Since its inception, this case has been concerned
with a recovery for alleged bad faith and conspiratorial claims
handling and settlement practices stemming from state asbestos
litigation.  The identities of the particular insureds who joined
in concert with defendants is, reduced to its essence, a detail.

Finally, as noted in Schillinger, "this suit is still
between the [plaintiffs] and others similarly situated (whomever
that may turn out to include) and [the defendants], and it
concerns the same claim[s] alleged in the original complaint."
Schillinger, 425 F.3d at 334.

Notwithstanding these rather straightforward
considerations, defendants assert a host of arguments to avoid
remand.  First, as noted, they contend that the amended
complaint's change of language to include "any and all" of their
insureds "has added tens of thousands of new UTPA claims to those
in the Initial Complaint."  (Adams Defs.' Jt. Oppos. at 11).[14]
This argument fails.  First, it misconceives the nature of the
litigation.  The claim in this action is that the defendants

_____

[14]This argument is at its zenith in Meninger, where the
original pleading alleged a WVUTPA claim relating to the
resolution of claims against a single insurer, Union Carbide.  In
contrast, the amended complaint claimed generally that the
defendants violated the WVUTPA in defending all of their
policyholders against asbestos claims.

46

violated the WVUTPA.  Whether this was done with respect to one
or one thousand insureds, or in one or one thousand separate
instances, is not of any great moment save that it may make the
litigation more complex.[15]  Greater complexity, however, is not
the test for whether a new action has commenced under CAFA.
Despite their present protestations, defendants have been
cognizant of this claim from the litigation's inception.

        Second, in a somewhat related vein, defendants contend
the expanded size and scope of the class merits a finding that a
new action was commenced for purposes of CAFA.  The following
quote from one response brief provides some necessary
elaboration:

> The expanded breadth of the Amended Complaint is
> illustrated by Plaintiffs' counsel's complaint in
> Adkins et al. v. Owens Corning Fiberglass Corp., filed
> on August 14, 1992 . . . .  Plaintiffs' counsel in the
> Adkins case is the same counsel as in the case at bar.
> The Adkins complaint enumerates 366 plaintiffs bringing
> suit against 30 defendants.  Notably, Plaintiffs
> numbered 209 in Adkins are Wanda and James Mellott, the
> same Wanda Mellott who is named Plaintiff in the case
> at bar who is suing as the personal representative for
> the estate of James Mellott.  Under the original

──────────────

[15]Interestingly some of the defendants appear to concede
plaintiffs' theory of the case remains unchanged between the
original and amended pleadings.  (Adams Defs.' Jt. Oppos. at 20)
("Here, Plaintiffs are not seeking to apply a new legal theory to
the same operative facts -- rather they are trying to apply the
same legal theory to thousands of new sets of operative facts.")
(emphasis supplied).

47

complaint, the AIG Defendants were defending their
claims handling activity -- actually non-activity --
with respect to the Mellotts' asbestos exposure claims
against CE.  Under the Amended Complaint, the Mellotts'
UTPA claims stemming from the <u>Adkins</u> complaint alone
are increased thirty-fold.  Since this case is a
purported class action, the math is even more mind-
boggling.  Under the Amended Complaint, the Mellott
claims against 30 defendants are representative of the
more than 365 plaintiffs in Kanawha County Civil Action
Nos. 92-C-4035--4400.  Conservatively calculated, these
366 plaintiffs' claims against 30 defendants give rise
to well over 10,000 potential combinations of alleged
UTPA violations.

(<u>Wise I</u> Defs.' Jt. Resp. at 27).[16]

The difficulty with this argument is that it focuses
not on the <u>core</u> of operative facts, but upon, by analogy, the
outer fruit and skin.  The amended action need not have complete
identity with the action as originally filed for relation back to
be appropriate.  In any event, defendants' contention has been

---

[16]As plaintiffs note, it is a bit speculative to assert the
class has dramatically increased in size as a result of the
amendment.  The consolidated actions against the insurers arose
out of the original state actions against their insureds.
Plaintiffs contend that in those original state court actions, a
very similar group of defendant-insureds was sued in every case.
This representation is significant.  If substantially the same
defendant-insureds appeared in the underlying complaints, one
would not expect the number of class members to increase
dramatically by virtue of the amendment.  As illustrated by
plaintiff, "if John Doe sued one of AIG's insureds . . . he, in
all likelihood, also had a group of about 30 other companies on
his complaint . . . .  Thus, John Doe was a class member under the
original complaint, and will still be a class member under the
Amended Complaint."  (Pls.' Reply Br. in <u>Wise II</u> at 9.)

previously rejected.  As noted in <u>Brooks</u>, relation back is
appropriate where the amendments state a claim growing out of the
specified conduct of the defendant which gave rise to the
original cause of action.  The "new claims," as characterized by
defendants, grow out of, and indeed were always embedded within,
the same misconduct alleged by plaintiffs in the initial
pleadings.  As in <u>Schillinger</u>, even after the amendments this
case still concerns "the same claim alleged in the original
complaint[,]" with perhaps some additional factual predicates.
<u>Schillinger</u>, 425 F.3d at 334 (emphasis supplied); (Pls.' Supp.
Memos. in Supp. at 5 ("The Amended Complaints simply reiterate
the conduct of the insurers in violation of the WVUTPA and
recognize that the acts of the same defendants were on a larger
scale than previously known.  Thus, the Amended Complaints do not
initiate new claims against the defendants but rather simply
further define the scope of conduct giving rise to the claims as
they were originally ple[]d.").[17]

　　　　Third, defendants assert the amended complaints

_____

[17]Defendants cite pre-CAFA cases suggesting a different
result.  To avoid further lengthening this opinion, the court
observes the cases are both factually and legally inapposite.  At
a minimum, they do not take account of the unique jurisdictional
posture of this litigation, along with the defendants' burden to
prove up the existence of removal jurisdiction under CAFA.

"fundamentally change[d] the nature of this action[.]"   (<u>Wise I</u>

Jt. Resp. at 22).  As earlier noted in <u>Knudsen</u>, however, this is

not an independent justification for deeming an action to have

been commenced anew by amendment:

> Liberty Mutual concedes that routine changes do not
> allow removal but insists that a "substantial" or
> "significant" change must do so. Yet significance is
> not the measure of a new claim; a plaintiff may assert
> an entirely novel legal theory in midsuit without
> creating a "new" claim in the sense that the defendant
> could block it by asserting that it had been propounded
> after the period of limitations expired. Moreover,
> "significance" often lies in the eye of the beholder;
> it is not a rule of law so much as it is a cast of mind
> or an assessment of likely consequences, which may be
> difficult if not impossible to foresee. A doctrine of
> "significant change" thus would go against the
> principle that the first virtue of any jurisdictional
> rule is clarity and ease of implementation.

<u>Knudsen</u>, 411 F.3d at 806.

Finally, defendants contend the amended complaints

allege a different core of operative facts than the initial

complaints.  They point again to the situation faced by CCC,

which they suggest had little if any potential liability under

the initial complaint but "far broader" liability under the

amended complaint.  (<u>Adams</u> Defs.' Jt. Oppos. at 16).  They next

contend that evidence concerning what any particular insured knew

or should have known about the hazards of asbestos will vary by

insured, as will evidence of alleged suppression of key facts

relating to liability.  They appear to assert there are now a
conglomeration of thousands of actions within this case and that
the same transaction test cannot be satisfied.[18]

   This position finds no support in either plaintiffs'
pleadings or their representations about how they will pursue the
litigation.  Undoubtedly, as with the initial complaint, there
may be factual variations between insureds as the case develops.
(See Wise I Defs.' Resp. at 29 ("The heart of the new complaint .
. . is based on new conduct in different underlying cases,
involving additional claims, additional Plaintiffs, additional
defense counsel, additional manufacturers, as well as new
distributors, sellers, and suppliers of asbestos-containing
products . . . . ").  The court simply cannot, however, accept
the speculative parade of horribles offered by defendants in
putative discharge of their jurisdictional burden.

   Lost in defendants' oft-repeated hypothetical arguments

_____

   [18]Some of the defendants contend "The differences between
the original complaint and the Amended Complaint in this case are
significant and far-reaching, and these differences change the
original action into an inestimably larger action and, therefore,
a new action altogether."  (Wise I Defs.' Resp. at 23).  Again,
this observation reflects a misunderstanding of the Rule 15(c)
standard. See Schillinger, 425 F.3d at 334 (stating "the
potential for a larger amount of legal research and discovery in
and of itself is not a significant enough step to create new
litigation.")

is an appreciation of the stage of this litigation.  This is a jurisdictional inquiry where defendants shoulder the ultimate responsibility of demonstrating the propriety of removal jurisdiction.  Faced with this formidable task, defendants have not satisfied their burden.

As noted, the initial and amended complaints are based upon, at a minimum, the same general conduct.  The <u>core</u> of operative facts in the amended complaints remain the same as that in the initial pleadings: the defendants knew that the defenses they were asserting to asbestos personal injury and wrongful death claims were unfounded across the board, that this conduct harmed plaintiffs, and that it is actionable under the WVUTPA. Despite the addition of insureds, however profound, the claims, parties, and core issues remain the same.  Although defendants protest there is no "central all-or-none issue" in this case, plaintiffs' overarching theory of the case portends otherwise. (<u>Adams</u> Defs.' Jt. Oppos. at 20).

Based upon the foregoing, the court concludes removal jurisdiction cannot be based upon CAFA.  The court, accordingly, turns to the remaining ground for federal subject matter jurisdiction.

52

B.   Related-To Jurisdiction


        Title 28 U.S.C. § 1334(b) provides pertinently as

follows:

> Except as provided in subsection (e)(2), and
> notwithstanding any Act of Congress that confers
> exclusive jurisdiction on a court or courts other than
> the district courts, the district courts shall have
> original but not exclusive jurisdiction of all civil
> proceedings arising under title 11, or arising in or
> related to cases under title 11.

28 U.S.C. § 1334(b) (emphasis supplied).  Title 28 U.S.C.

1452(a) provides further as follows:

> A party may remove any claim or cause of action in a
> civil action . . . to the district court for the
> district where such civil action is pending, if such
> district court has jurisdiction of such claim or cause
> of action under section 1334 of this title.

28 U.S.C. § 1452(a).


        Reading the statutes in pari materia, removal

jurisdiction is dependent upon these actions, or claims within

them, being related to a case under title 11.  The parties

dispute this issue at great length.  Assuming that removal

jurisdiction is present, however, the court would examine the

propriety of exercising its discretion to abstain pursuant to 28

U.S.C. § 1452(b), which provides as follows:

53

> The court to which such claim or cause of action is
> removed may remand such claim or cause of action on any
> equitable ground.

28 U.S.C. § 1452(b).  The defendants in <u>Wise II</u>, <u>Adams</u>, and

<u>Meninger</u>[19] offer a variety of largely overlapping factors for

consideration under section 1452(b) as follows:

> "(1) the court's duty to resolve matters properly
> before it; (2) the predominance of state law issues and
> non-debtor parties; (3) the economical use of judicial
> resources; (4) the effect of remand on the
> administration of the bankruptcy estate; (5) the
> relatedness or remoteness of the action to the
> bankruptcy case; (6) whether the case involves
> questions of state law better addressed by the state
> court; (7) comity considerations; (8) any prejudice to
> the involuntarily removed parties; (9) forum non
> conveniens; (10) the possibility of inconsistent
> results; (11) any expertise of the court where the
> action originated; and (12) the existence of a right to
> a jury trial."

(<u>Adams</u> Jt. Oppos. at 37-38 (quoting <u>Blanton v. IMN Fin. Corp.</u>,

260 B.R. 257, 265 (M.D.N.C. 2001)); <u>see also</u> <u>Wise II</u> Resp. in

Oppos. at 18-19).

      First, this action is based purely upon state law.

Additionally, none of the parties are debtors.  Second, if the

cases are remanded, they will be superintended by a single judge

whose actions just prior to removal indicate he will manage the

---

[19]As noted, the defendants in <u>Wise I</u> have disavowed their
reliance on "related to" jurisdiction as a ground for removal.
(<u>Wise I</u> Memo. in Oppos. at 19 n.16).

54

case with an eye toward a fair and expeditious result.

Third, plaintiffs note there will be great duplication of judicial resources if remand is denied, given that certain claims will require transfer to different bankruptcy courts throughout the country. One is reminded of the axiom that the shortest distance between two points is a straight line. It thus seems more appropriate for defendants to proceed directly to each affected debtor's home court for relief under any applicable channeling injunction or similar order. Defendants' suggested approach would place this court in the role of a functional transfer intermediary, resulting in certain delay to both the plaintiffs and some of the defendants while the transfer protocol is developed and implemented.

Fourth, the court notes these four actions are confined to WVUTPA claims between non-debtor entities. They are thus quite remote from the issues presented in the bankruptcy cases that they might impact. Fifth, these actions involve the conduct of regulated insurers in the midst of what may be the most complex piece of mass litigation ever entertained in West Virginia. Over the years, the state court system has devoted an immense amount of resources to the resolution of the underlying cases. There is thus some merit in allowing that same system to

examine the nature and effect of the WVUTPA allegations in this related case.  This same consideration influences the court's notion of how comity is best served.

Sixth, plaintiffs note the prejudice they face as involuntarily removed parties if remand is denied: "Plaintiffs will be forced to litigate their claims in various federal forums across the country, which will cause great inconvenience."  (Wise II Pls.' Reply Br. at 19).  Seventh, one cannot deny the expertise of West Virginia state courts in resolving the sometimes delicate issues that arise under the WVUTPA.  Finally, plaintiffs enjoy the right to a jury trial on their claims.

This analysis illustrates that a majority of the applicable factors weigh in favor of equitable remand.  The court, accordingly, concludes that, assuming related-to jurisdiction is appropriate, equitable remand is appropriate pursuant to section 1452(b).

### III.

Based upon the foregoing, the court ORDERS that plaintiffs' motions to remand in the consolidated actions be, and they hereby are, granted.  The court further ORDERS that the four

56

consolidated actions be, and they hereby are, remanded to the Circuit Court of Kanawha County for all further proceedings.[20]

The Clerk is directed to forward a copy of this written opinion and order to counsel of record and a certified copy to the clerk of court for the Circuit Court of Kanawha County.

DATED:  March 30, 2006

John T. Copenhaver, Jr.
United States District Judge

---

[20]Defendants request a stay in the event remand is ordered to permit them time to consider an appeal pursuant to 28 U.S.C. § 1453(c).  Defendants have not offered any showing in support of the request.  The court, accordingly, ORDERS that the requested stay be, and it hereby is, denied.